# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARCUS SULLIVAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 15-1234 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## O R D E R

This matter is now before the Court on Petitioner, Marcus Sullivan's ("Sullivan"), Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.  For the reasons set forth below, Sullivan's § 2255 Motion [1] is DENIED.

### BACKGROUND

Sullivan was charged by criminal complaint on July 27, 2012.  On August 23, 2012, he was indicted on a charge of conspiracy to manufacture, distribute, and possess with the intent to distribute at least 280 grams of crack cocaine, distribution of crack cocaine, and possession with the intent to distribute at least 28 grams of crack cocaine. Given his prior felony drug conviction, Sullivan faced a statutory penalty of 20 years to life if convicted.

The Government then extended a proposed plea agreement to Sullivan's counsel providing for Sullivan to plead guilty to the conspiracy count, an agreed sentence of 17 years' imprisonment, the withdrawal of its notice under 21 U.S.C. § 851 (which would result in the reduction of his mandatory minimum from 20 years to 10 years), and this dismissal of all other counts.  Sullivan accepted the plea offer pursuant to Fed.R.Crim.P. 11(c)(1)(C), on February 3, 2014, after a lengthy plea colloquy.  The document further provided the parties' agreement that Sullivan waived his right

to direct appeal and collateral attack.  Following a number of adjustments and objections at sentencing, Sullivan had an advisory guideline range of 292 to 365 months in prison.  However, he was sentenced to the agreed term of 17 years (204 months) in accordance with the plea agreement.

Sullivan now brings this § 2255 motion in which he argues that counsel provided ineffective assistance in nine ways, his sentence was imposed in violation of United States v. Booker, an evidentiary hearing is required, and he is actually innocent of being in the conspiracy from 2001 to 2010.  The Government has filed its response, and this Order follows.

## DISCUSSION

A petitioner may avail himself of § 2255 relief only if he can show that there are "flaws in the conviction or sentence which are jurisdictional in nature, constitutional in magnitude or result in a complete miscarriage of justice."  Boyer v. United States, 55 F.2d 296, 298 (7th Cir. 1995), *cert. denied*, 116 S.Ct. 268 (1995).  Section 2255 is limited to correcting errors that "vitiate the sentencing court's jurisdiction or are otherwise of constitutional magnitude."  Guinan v. United States, 6 F.3d 468, 470 (7th Cir. 1993), *citing* Scott v. United States, 997 F.2d 340 (7th Cir. 1993).

A § 2255 motion is not, however, a substitute for a direct appeal.  Doe v. United States, 51 F.3d 693, 698 (7th Cir.), *cert. denied*, 116 S.Ct. 205 (1995); McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996).  Federal prisoners may not use § 2255 as a vehicle to circumvent decisions made by the appellate court in a direct appeal.  United States v. Frady, 456 U.S. 152, 165 (1982); Doe, 51 F.3d at 698.  Accordingly, a petitioner bringing a § 2255 motion is barred from raising:  (1) issues raised on direct appeal, absent some showing of new evidence or changed circumstances; (2) nonconstitutional issues that could have been but were not raised on direct appeal; or (3) constitutional issues that were not raised on direct appeal, absent a showing of cause for the default and actual prejudice from the failure to appeal.  Belford v. United States, 975 F.2d 310, 313 (7th Cir.

1992), *overruled on other grounds by* Castellanos v. United States, 26 F.3d 717, 710-20 (7th Cir. 1994).

Sullivan would appear to be barred from bringing this § 2255 motion by virtue of the fact that his plea agreement contains a waiver of his right to bring a collateral attack on his sentence. So long as the plea agreement stands, the waiver of the right to appeal or pursue collateral relief must generally be enforced. Id., *citing* United States v. Wagner, 103 F.3d 551 (7th Cir. 1996); Jones v. United States, 167 F.3d 1142, 1144-45 (7th Cir. 1999) (finding that the right to appeal can survive a waiver where the agreement itself is involuntary, the trial court relied on a constitutionally impermissible factor, or the sentence exceeded the statutory maximum). The validity of the appeal waiver depends on whether the waiver was "express and unambiguous" and whether the record clearly shows that the waiver was made "knowingly and voluntarily." United States v. Woolley, 123 F.3d 627, 632 (7th Cir. 1997)

Sullivan attempts to void the plea agreement and waivers contained therein by claiming that he received ineffective assistance of counsel. The seminal case on ineffective assistance of counsel is Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Court stated that in order for a prisoner to demonstrate that counsel's performance fell below the constitutional standard, the petitioner would have to show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. A prisoner must also prove that he has been prejudiced by his counsel's representation by showing "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The courts, however, must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 690.

To satisfy <u>Strickland</u>'s prejudice prong in this case, Petitioner must demonstrate through objective evidence a reasonable probability that, but for counsel's purportedly erroneous advice, he would not have entered the guilty plea and would have insisted upon going to trial. <u>Woolley</u>, 123 F.3d at 635. "It is far from obvious how a petitioner is expected to make such a showing, but it is clear that 'merely making such an allegation is insufficient.'" <u>United States v. Ryan</u>, 986 F.Supp. 509, 513 (N.D.Ill. 1997), *citing* <u>Key</u>, 806 F.2d at 139; *see also* <u>McCleese v. United States</u>, 75 F.3d 1174, 1179 (7th Cir. 1996) (requiring that the petitioner establish through objective evidence that he would not have accepted the plea).

Here, Sullivan does not make any legitimate argument that his plea (which included waivers of the right to bring a direct appeal and collateral attack) was not knowingly and voluntarily entered into as a result of ineffective assistance of counsel. Specifically, he claims that counsel (1) failed to investigate and file a motion to suppress evidence seized; (2) failed to investigate or object to improper conduct by the prosecutor before the grand jury; (3) failed to object to the confidential informant's hearsay testimony to the FBI, grand jury, and at sentencing; (4) failed to investigate and object to the drug quantity in the indictment; (5) not objecting to the PSR and all the enhancements made within the PSR; (6) failed to investigate and object to the criminal complaint; (7) failed to investigate or object to prosecutorial conduct due to his personal opinions of Sullivan; (8) failed to seek a misjoinder or to sever defendants in the indictment; and (9) failed to raise any mitigating factors at sentencing.

Only in his traverse does Sullivan allege that his plea agreement was not intelligent because the information provided to him by the Government and his counsel was erroneous. He states that he misunderstood the Government's method of proving the quantity of drugs in the conspiracy, was

told "if you don't take this plea, then I can't help you," and was not given a reasonable amount of

time to decide whether to take the offer with his family.

The written plea agreement clearly stated:

> 11.  The defendant is aware that federal law affords a defendant a right to appeal a final decision of the district court, including the conviction and sentence imposed. Understanding his rights to appeal, and having thoroughly discussed these rights with his attorney, the defendant knowingly and voluntarily waives the right to appeal any and all issues relating to this plea agreement, his conviction, and his sentence, so long as the sentence of imprisonment is 204 months and the amount of any fine or restitution and term of supervised release are within the maximum provided in the statutes of conviction. The defendant's waiver of the right to appeal is in exchange for the concessions made by the United States in this plea agreement.

> 12.  The defendant also understands that he has a right to attack the conviction and/or sentence imposed collaterally on the grounds that it was imposed in violation of the Constitution or laws of the United States; that he received ineffective assistance from his attorney; that the Court was without proper jurisdiction; or that the conviction and/or sentence was otherwise subject to collateral attack. The defendant understands such an attack is usually brought through a motion pursuant to Title 28, United States Code, Section 2255. The defendant and the defendant's attorney have reviewed Section 2255, and the defendant understands his rights under the statute. Understanding those rights, and having thoroughly discussed those rights with the defendant's attorney, the defendant knowingly and voluntarily waives his right to collaterally attack the conviction and/or sentence with one exception: <u>the defendant may raise on collateral attack only those discrete claims which relate directly to the negotiation of this waiver.</u> The defendant acknowledges that the decision to waive the right to challenge any later claim of the ineffectiveness of the defendant's counsel was made by the defendant alone notwithstanding any advice the defendant may or may not have received from the defendant's attorney regarding this right. The defendant's waiver of his right to collaterally attack the conviction and/or sentence is in exchange for the concessions made by the United States in this plea agreement.

(Plea Agreement, at 3-4).

By signing the plea agreement, Sullivan also accepted the factual stipulation contained in the document.

> From approximately 2001 through at least August 1, 2012, MATTHEW G. SULLIVAN ("MATTHEW") and others conspired with each other to manufacture, distribute, and possess with the intent to distribute cocaine bases, or crack cocaine. By at least in or abut 2010, the defendant, MARCUS R. SULLIVAN ("MARCUS"), knowingly became a member of the conspiracy with the intention of furthering the conspiracy. The conspiracy involved more than 280 grams of cocaine base ("crack cocaine"), and the amount of crack cocaine attributable to the defendant by his conduct, and the conduct of his co-conspirators that was reasonably foreseeable to him, was more than 280 grams.

(Plea Agreement, at 8). The written agreement also contained the following representation by Sullivan:

> I have read this entire plea agreement carefully and have discussed it fully with my attorney. I fully understand this agreement, and I agree to it voluntarily and of my own free will. I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this agreement about my criminal conduct are true. No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, expressed or implied, to influence me to plead guilty other than those stated in this written plea agreement. I am satisfied with the legal services provided by my attorney. I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this plea agreement.

(Plea Agreement, at 14-15).

A review of the transcript of the plea hearing reveals that after a detailed discussion of the maximum sentence he could face, Sullivan received a lengthy explanation of the waiver provision and its consequences during the plea colloquy. As set forth below, this explanation was more than sufficient to remedy any misinformation (or lack of information) that may have been provided by his counsel with respect to the waiver or penalty provisions, and hence, he has failed to demonstrate

actual prejudice under <u>Strickland</u>. This same dialogue also demonstrates the knowing and voluntary nature of Sullivan's waiver and guilty plea, as well as his competency.

When the Court accepted Sullivan's guilty plea, it held a lengthy change of plea hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure. Rule 11 "provides protection for those who voluntarily choose to waive their constitutional right to a trial by pleading guilty while ensuring an adequate record to insulate the plea from appellate and collateral attacks." <u>Key v. United States</u>, 806 F.2d 133, 136 (7th Cir. 1986). Rule 11 also provides for a colloquy that "exposes the defendant's state of mind in the record through personal interrogation." <u>Id.</u>, *citing* <u>United States v. Fountain</u>, 777 F.2d 351, 356 (7th Cir. 1985). This aspect of the Rule 11 hearing is especially important with respect to subsequent collateral proceedings, because the representations made by the defendant during a plea colloquy, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding. <u>Id.</u>, *citing* <u>Thompson v. Wainwright</u>, 787 F.2d 1447 (11th Cir. 1986); <u>Blackledge v. Allison</u>, 431 U.S. 63, 97 S.Ct. 1621, 1629 (1977). Furthermore, "[s]olemn declarations in open court carry a strong presumption of verity." <u>Blackledge</u>, 97 S.Ct. at 1629.

> Q.    So you went to one year at a junior college?
>
> A.    Yeah. Well, I went – I attended several universities.
>
> Q.    Okay. Can you read and write?
>
> A.    Yes.
>
> Q.    Have you ever been treated for any mental illness?
>
> A.    No.
>
> Q.    Have you been treated for any addiction to narcotic drugs of any kind?
>
> A.    No.

Q.      Are you currently under the influence of any drug, medication, or alcoholic beverage?

A.      No, sir.

Q.      Have you received a copy of the indictment, that is, the written charges made against you?

A.      Yes, sir.

Q.      Have you had a chance to discuss those with Mr. Hanna?

A.      Yes, sir.

Q.      Have you had a chance to review the discovery in this case and go over any possible defenses that you have with Mr. Hanna?

A.      Yes, sir.

Q.      Are you satisfied with Mr. Hanna's representation to this point?

A.      To a level.

Q.      To a level?

A.      I can't – you know, I'm not going – I just feel like I will never be fully satisfied, you know, things won't work out the way that I want it to so . . .

Q.      So – I understand.  So you would prefer that this matter would go away as opposed to sitting here pleading guilty?

A.      I would, but it doesn't seem like it's going to happen.

Q.      So did you have an opportunity to read and discuss the plea agreement with Mr. Hanna before you signed it?

A.      Yes, sir.

Q.      Does the plea agreement represent your entire understanding or the entire understanding that you have with the government?

A.      Yes, sir.

Q.      Do you think that you understand the terms of the plea agreement?

A.      Yes, sir.

Q.      Has anyone made any promises or assurances to you that are not in the plea agreement to persuade you or to get you to plead guilty?

A.      No, sir.

Q.      Has anyone threatened you in any way to get you to plead guilty?

A.      No, sir.

Q.      All right.  It's my understanding that you are going to plead guilty to a certain period of time.  And if you – and if I accept that then I will sentence you to that certain time.  Do you understand that?

A.      Yes, sir.

Q.      If I don't accept that then you will have an opportunity to withdraw your plea agreement; do you understand that?

A.      Yes, sir.

Q.      Okay.  Let's go over it then.  All right.  Page two, the charges set forth in paragraph four.  You're charged in Count One, you're charged in Counts Two and Three.  You're charged in Count Seven.  You're charged in Counts Eight and Eleven.  The charges are conspiracy to manufacture, distribute, and possess with intent to distribute cocaine in Count One.

        Distribution of cocaine base in Two and Three.

        Distribution of cocaine base in Count Seven.

        Possession with the intent to distribute cocaine base in Counts Eight and Eleven.

        Do you understand that?

A.      Yes, sir.

Q.      Now, you're only pleading guilty to Count One; is that correct?

A.     Yes, sir.

Q.     Count One is set forth in paragraph seven: To sustain the charge of drug trafficking conspiracy, the government must prove the following beyond a reasonable doubt:

First, the conspiracy charged in Count One existed.

And second, that you knowingly became a member of the conspiracy with an intention to further the conspiracy.

Do you understand the charges against you?

A.     Yes, sir.

Q.     Do you understand the government would have to prove the elements of these charges as set forth in Count Seven against you beyond a reasonable doubt?

A.     Yes, sir.

Q.     To establish the mandatory minimum sentence of ten years and increase the statutory maximum term of imprisonment to life, the United States would also have to prove beyond a reasonable doubt that the conspiracy involved at least 280 grams of cocaine base.

And then moving on to page three, the amount of cocaine base attributable to you through your conduct and the conduct of co-conspirators that was reasonably foreseeable to you was at least 280 grams.  Do you understand that?

A.     Yes, sir.

Q.     The possible penalties are as follows:

The crime to which you are pleading guilty is set – the possible penalties are set forth in paragraph eight. There are – at least ten years in prison and up to life, a fine of up to $10 million, at least five years and up to life of supervised release, a $100 special assessment, and the forfeiture of the items listed in the note of forfeiture.  Do you understand that?

A.     Yes, sir.

Q.    The supervised release period that I mentioned, five years and up to a lifetime, has its own terms and conditions. Any violation of those terms and conditions could result in your supervised release period being revoked and you being imprisoned for all or part of that supervised release period without credit for time previously served. Do you understand that?

A.    Yes, sir.

* * *

Q.    Paragraph 11 discusses your waiver of right to appeal. Federal law affords you a right to appeal a final decision of the district court, including the conviction and sentence imposed. This paragraph on page three and the top of four tells me that you understand these rights.

A.    Yes, sir.

Q.    That you have thoroughly discussed these rights with Mr. Hanna; that you knowingly and voluntarily waive your right to appeal the conviction and the sentence so long as the term of imprisonment is 204 months as you have agreed upon. And the knowingly and voluntary waiver of right to appeal is made without any threats or promises to you other than receiving the 204 months; is that correct?

A.    Yes, Your Honor.

Q.    Do you have any questions about that?

A.    No, sir.

Q.    The paragraph 12 discusses a different type of waiver of post-conviction, a waiver of right to collateral attack. You have a right to collaterally – to attack the conviction and/or sentence collaterally on the grounds that it was imposed in violation of the Constitution or laws of the United States; that you received ineffective assistance of counsel; that the Court was without proper jurisdiction; or that the conviction and/or sentence was otherwise subject to collateral attack. Do you understand that?

A.    Yes, sir.

Q.      This paragraph goes on to tell me as well that you understand this, that you have discussed this with Mr. Hanna; that you knowingly and voluntarily waive your right to attack, collaterally attack the sentence in order to enter into this plea agreement with the government; is that correct?

A.      Yes, sir.

Q.      Okay.  Paragraph 13 is the agreement here.  This is pursuant to 11(c)(1)(C) and the parties are – both your attorney and you and Mr. Walters are requesting that I sentence you to 204 months in prison. Do you understand that?

A.      Yes, sir.

                              * * *

Q.      The – assuming that there was no agreement and I were to make this determination based upon the Sentencing Guidelines, you would have – I would have probation and they will any way with the Presentence Report, they will determine your guideline range based upon a combination of advisory guidelines and other statutory sentencing factors. Now, I'm assuming that as some point you and Mr. Hanna talked about the guidelines and maybe haven't gotten into the specifics of what your guideline range might be but for this agreement, but, if you have, Mr. Hanna, I will ask you to say it.

Mr. Hanna.   We have, Judge.  And what I indicated to Mr. Sullivan is that absent this agreement to a specific term that is under the mandatory minimum had their been a blind plea in this case, he would have been subject to at least 240 months in the Bureau of Prisons.  And the range that I gave him, if this matter were to proceed to trial, without acceptance of responsibility was between 262 to 327 months.

Q.      Okay.  Understand that, Mr. Sullivan?

A.      Yes, sir.

Q.      Now that probably won't apply here because of this agreement, but I have to accept it first, and I will order a Presentence Report to do so.  But if the guideline range were to apply, probation would determine that as part of the

Presence Report. You and your attorney and Mr. Walters would have an opportunity to object to those calculations. I would make the final determination. And then once I make that final determination, then there would be arguments as to the sentencing alternatives. And I have authority in some circumstances to go upward or downward from that range. So ultimately, I would decide the sentence and what Mr. Hanna would give you would just be an estimate. Do you understand that?

A.     Yes, sir.

* * *

Q.     All right. Factual basis from the government please.

Mr. Walters.     Thank you, Your Honor. If this matter proceeded to trial, the United States would introduce evidence establishing, among other things, the facts set forth on pages eight through 12 of the plea agreement.

From approximately the early 2000s until, at least, August 1st of 2012, Matthew Sullivan, Marcus' brother, and others conspired with each other to manufacture, distribute, and possess with the intent to distribute cocaine base or crack cocaine.

By at least approximately 2010, the defendant, Marcus Sullivan – who I will refer to as Marcus as I read – knowingly became a member with the conspiracy with an intention to further it. The conspiracy involved more than 280 grams of cocaine base or crack cocaine, and the amount of crack attributable to the defendant by his own conduct and the conduct of co-conspirators reasonably foreseeable to him was more than 280 grams.

In furtherance of the conspiracy and to accomplish its purposes, Matthew and Marcus would regularly travel together, individually, and with other co-conspirators to one or more locations outside this district to obtain multiple ounces of cocaine that they would then bring back to the Bloomington-Normal area. Matthew and Marcus would then convert or cause to be converted portions of the cocaine into crack cocaine. Matthew and Marcus would then distribute crack to co-

- 13 -

conspirators and customers. They also discussed with each other the amount of cocaine they planned to obtain from their source of supply. They coordinated with the source of supply on behalf of each other. Examples of the above of this conduct include the example set forth on page 9, 10, 11 and 12.

On May 15 of 2012, Marcus distributed approximately one ounce of crack cocaine to Confidential Source 1. Prior to this distribution occurring, Confidential Source 1 participated in a call with Matthew that was recorded. During the call, Matthew told CS 1 that he was out of state. CS 1 told Matthew that he needed something to hold him over until Matthew's return. CS 1 asked Matthew if his brother – referring to him as his "B" – was around. Stating "you know what I'm talking about, tell him to treat me right. I will go grab a little something, something." Matthew responded, "All right. I got him. I got you, bro."

Immediately after this call, CS 1 participated in a recorded call with Marcus. During this call, CS 1 told Marcus that CS 1 had talked to Matthew who told CS 1 to, quote, "fuck with," end quote, Marcus. Marcus responded "Oh, for sure." CS 1 then ordered an ounce of crack by using the term or phrase "how many days in February" referring to 28 days which equals 28 grams. The source later met Marcus, and under the direction of law enforcement, purchased approximately one ounce of crack cocaine for $800.

On July 2nd, during the Title III operating of 2012, the FBI learned through Court authorized intercepted communications to and from target phone one, that being target Matthew's phone, and target phone two, that being Marcus' phone, and through surveillance that Matthew traveled with codefendant William Watts in a rental car to Rockford to meet with a Travares Perteete, and there they obtained approximately 17 ounces of cocaine.

At approximately 12:15 p.m. on July 2nd, Perteete sent a text message to Matthew that read, quote, "It's on. Call me." In other words, Perteete was confirming that the planned drug deal was to occur that day.

Just prior to this text message, Perteete had spoke with Marcus at approximately 12:14. During the call, Marcus explained that Matthew had to find a ride to come and meet Perteete. Marcus further stated during this call, quote, "My man's just trying to see if he can find another ride. If not, see if you man will hold something down. If push comes to shove, see if he can hold it down until late tonight."

In short, Marcus was explaining that his brother, Matthew, was trying to find a ride and was asking Perteete to get with the supplier to see if he would hold back the cocaine for when Matthew got there to supply Matthew. Perteete agreed to do so.

Prior to Matthew leaving for Rockford, Marcus and Matthew spoke by phone. During the call Matthew verified that Marcus had provided Matthew with a certain amount of money toward a planned drug deal. Upon arriving in Rockford, Matthew and Watts met with Perteete. After meeting with Perteete, Matthew and Watts then returned to the Bloomington-Normal area. Upon returning, Matthew sent Marcus a text message that read, quote "BCK" or back or informing him we are back. Marcus responded , Okay.

Upon Matthew's and Watts' return to the Bloomington area, Matthews [sic], Watts, and Marcus met at Matthew's residence. Title III interceptions that occurred after this trip to Rockford and prior to the next resupply trip to Rockford confirmed that at least a portion of the approximately 17 ounces of cocaine was converted into crack cocaine and distributed to customers in the Bloomington-Normal area including Marquelle. For example, on July 3rd, 2012, Marquelle Palmer twice ordered four ounce amounts of crack cocaine from Matthew. His orders were respectfully, quote, "four ready," end quote, and then, quote, four more," end quote. It was reasonably foreseeable to Marcus that Matthew would take a portion of the cocaine he obtained from Perteete and converted that cocaine into crack and distributed it.

On July 24, Title III interceptions, surveillance, and other investigating means revealed that Matthew, Marcus, and Michael Percell traveled to Rockford to

obtain cocaine from Perteete. During the morning hours of July 24, Matthew sent a text message to Perteete asking if Perteete had heard from his or her supplier. Shortly thereafter, during a phone call, Matthew stated, quote, "We fixing to head out now or drive to Rockford." "Moo" – that being Michael Percell – "fixing to come with me." Video surveillance in the vicinity of Matthew's residence revealed that Matthew left in a Dodge Charger and that Marcus and Percell left in a Dodge Durango. Tracker information and surveillance revealed that Matthew in the charger and Marcus and Percell in the Durango went to an address associated with Perteete. Title III interceptions revealed that while Matthew, Marcus, and Percell were in Rockford, Perteete arranged for a third party to supply quote, "seven," end quote, that being seven ounces of cocaine. Surveillance observed Marcus, Percell, and Perteete leaving the residence associated with Perteete in the Dodge Durango. They eventually arrived in a parking lot of a certain business in the Rockford area while the Durango was parked in the parking lot. Perteete got out of the Durango, got into a car that was parked near the Durango. The car departed for a brief period of time and then returned. Perteete got out of the car and got back into the Durango. The Durango then returned to the residence associated with Perteete. Video surveillance revealed that after departing Rockford, the Charger and Durango returned to 201 Masters Drive in Bloomington, Illinois, approximately at 11:30 p.m., which is where Matthew resided. Video surveillance revealed that Marcus walked to his residence, went inside the residence for approximately one minute, and then walked back to Matthew's residence. Thereafter, video surveillance revealed Matthew, Marcus, and Percell at the passenger side of the Dodge Charger for approximately nine minutes. Multiple times during the investigation, law enforcement confirmed through surveillance that Matthew would hide cocaine in door compartments of the charger.

Lastly, on August 1st, 2012, the FBI and other law enforcement agencies executed multiple search warrants in relation to the investigation of Matthew, Marcus, and others. The search warrants included,

but were not limited to, searches of Matthew's [sic] residence of Kelsey Shanahan where Marcus had spent the prior evening of July 31, 2012. During the execution of the search warrant at Matthew's residence, law enforcement seized approximately 130 grams of crack cocaine. During the execution of the search warrant at Kelsey Shanahan's residence, law enforcement seized approximately 80 grams of crack cocaine from a couch in which Marcus was sleeping when law enforcement entered the residence.

\* \* \*

Q.    Mr. Hanna, do you believe the government can produce such evidence at trial?

MR. HANNA:        Yes, Your Honor.

BY THE COURT:

Q.    Mr. Sullivan, did you hear what Mr. Walters just told me and did you read qhat's recited on pages 8 through 12 under factual basis?

A.    Yes, sir.

Q.    Are those facts correct as they pertain to your case?

A.    Yes, sir.

Q.    And are they in part the basis for your plea of guilty and willingness to enter into this plea agreement?

A.    Yes, sir.

Q.    Okay. You are pleading guilty to a felony offense. If your plea is accepted, you will be adjudged guilty of that offense and such adjudication may deprive you of valuable civil rights such as the right to vote, the right to possess any kind of firearm. Do you understand that?

Do you have any questions at this time?

A.    No, sir.

Q.      Do you believe that you understand the charge against
        you that you are pleading guilty to?

A.      Yes, sir.

Q.      The possible penalties?

A.      Yes, sir.

Q.      The elements of that charge?

A.      Yes, sir.

Q.      Your waiver of rights of appeal?

A.      Yes, sir.

Q.      Your rights to trial?

A.      Yes, sir.

Q.      And your rights at trial?

A.      Yes, sir.

Q.      Do you have any questions at all?

A.      Not at this time.

* * *

Q.      With that in mind then, sir, how do you plead to
        Count One, the charge of drug trafficking conspiracy
        or conspiracy to manufacture, distribute, and possess
        with intent to distribute cocaine base in violation of
        United States Code?

THE DEFENDANT:  Guilty.

THE COURT:      All right.  I find that you are fully competent and
                capable of entering an informed plea, that you are
                aware of the nature of the charge, the consequences
                of the plea, the plea of guilty is a knowing and
                voluntary plea supported by an independent basis
                in fact containing each of the essential elements of the
                offense.  The plea is accepted.

- 18 -

(Change of Plea Hearing, 4 - 24).

The Court finds that nothing in the record even remotely suggests that Sullivan did not knowingly and voluntarily enter the plea agreement, including the waiver provisions contained therein.  To the contrary, it clearly indicates that he expressly acknowledged the potential penalties he faced and waived his rights to appeal and pursue collateral relief after extensive questioning and explanation by the Court.  Thus, the record also demonstrates that the Court provided him with a lengthy and detailed explanation of the possible penalties and waiver provisions that was more than adequate to supplement or correct any lack of information or misinformation that may have been provided by counsel.  Sullivan clearly and unequivocally acknowledged that the sentence ultimately imposed could be different from any estimate given by his attorney and could even be higher.  After receiving this explanation, Sullivan proceeded to state that he was acting voluntarily and understood everything as it had been explained to him by the Court.  The fact that he now wishes he had been able to obtain a more favorable deal does not negate the fact that he has waived the right to collaterally challenge his conviction or sentence.

Even assuming that Sullivan had not waived his right to bring this challenge, his allegations of ineffective assistance of counsel are frivolous and flatly contradicted by the record.  The search warrant for his apartment described the place to be searched with particularity, including a color photograph of his front door, and was supported by a detailed affidavit establishing probable cause. He complains about alleged comments of the prosecutor to the grand jury that are not supported by the transcript of the grand jury proceedings, as well as a comment during sentencing that could have had no impact on his sentence given that he pled guilty in a negotiated agreement calling for the very sentence that he received.  Sullivan complains about the statement of a witness to the grand jury and the fact that he was not able to suppress or confront this witness.  However, a defendant has no right

to confrontation at sentencing under the Sixth Amendment. *United States v. Ghiassi*, 729 F.3d 690, 695 (7th Cir. 2013). Sullivan's complaints about drug quantity and role in the offense are flatly contradicted by the admissions that he made in the plea agreement and during the plea colloquy. Sullivan's attorney made all of the objections to the PSR that he claims should have been made; the fact that the objections were ultimately unsuccessful does not establish ineffective assistance. Objections to the criminal complaint would have been futile in light of the fact that Sullivan pled guilty to the indictment, as would any motion to sever himself from the charged conspiracy involving his brother and others. Given the stipulated sentence agreed to in the plea agreement, the arguments in mitigation Sullivan faults his counsel for not offering would also have been unavailing.

Sullivan's other claims, that his sentence was imposed in violation of the Constitution because certain enhancements to his sentence were not proven to a jury and that he is actually innocent of the conspiracy because he was only involved as a buyer/seller, are not based on new evidence or matters outside the record. They therefore could have been presented on direct appeal but were not and are waived. *Barker v. United States*, 7 F.3d 629, 632 (7th Cir. 1993). His claims are also frivolous, as he ignores the factual basis for the plea, which he acknowledged and admitted both orally and in writing. Sullivan is not entitled to relief on his § 2255 motion for this additional reason.

### CERTIFICATE OF APPEALABILITY

To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C § 2253(c)(2). The petitioner must also show that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude

either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Id.

Here, no reasonable jurist could conclude that Sullivan's claim was not flatly contradicted by the record in this case, as well as the established law of this Circuit.  Accordingly, this Court will not issue him a certificate of appealability.

## CONCLUSION

For the reasons set forth herein, Sullivan's Motion to Vacate, Set Aside, or Correct Sentence pursuant to § 2255 [1] is DENIED.  This matter is now terminated.

ENTERED this 29th day of March, 2016.


s/ James E. Shadid
James E. Shadid
United States District Judge